# Richmond.

## ATLANTIC COAST LINE RAILROAD CO. v. GRUBBS.

### March 14, 1912.

1. DEMURRER TO EVIDENCE—*Judgment to be Entered—Negligence.*—Upon a demurrer to the evidence by a defendant, if the evidence is such that the jury might have rightly found that the defendant was guilty of the negligence charged in the plaintiff's declaration, and that the plaintiff was free from negligence contributing proximately to the causes of his injury, the court must so find.

2. RAILROADS—*Grade Crossing—Obstructed View—Noises—Care Required.*—Where the view of a grade crossing of a railroad and highway is obstructed, and noises interfere with hearing approaching trains, a higher degree of caution is required of both the traveler and the railroad company than if the obstructions and noises did not exist; the degree of caution of both parties being in proportion to the danger from the obstruction and noise.

3. RAILROADS—*Grade Crossing—Open Gates—Care Required.*—Open gates at a railroad crossing do not relieve a traveler on a highway of the duty of exercising ordinary care for his own safety, but the raising of the gates is a circumstance which justifies the traveler in starting to cross the railroad, and whether, under the circumstances, the traveler exercised due care for his own safety is a question for the jury.

4. DEMURRER TO EVIDENCE—*Contributory Negligence—Finding of Court.*—Contributory negligence of the plaintiff is an affirmative defense, and the burden is on the defendant to prove it, and where, upon a demurrer to the evidence by the defendant, the question is whether or not the plaintiff was guilty of contributory negligence, the court must find that he was not, where the facts do not so plainly disclose it that reasonable men should not differ in their judgment upon it.

5. JUDGMENTS—*Interest—Appeal and Error.*—If a verdict is found which does not allow interest, judgment should be entered for the sum found with interest from the date of the verdict, under the express terms of section 3390 of the Code, and if the trial court has failed to enter judgment for the interest, its judgment will be amended in this respect on cross error assigned by the plaintiff in this court.

Error to a judgment of the Hustings Court, Part II., of the city

of Richmond, in an action of trespass on the case.   Judgment for the plaintiff.   Defendant assigns error.

*Amended and Affirmed.*

The opinion states the case.

*William B. McIlwaine* and *E. P. Cox*, for the plaintiff in error.

*George C. Gregory* and *Samuel A. Anderson*, for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

H. L. Grubbs brought this action in 1908 against the Atlantic Coast Line Railroad Company and the Norfolk and Western Railway Company, jointly, to recover damages for personal injuries alleged to have been sustained by the plaintiff because of the negligence of the defendants.   Later the plaintiff filed an amended declaration against the Atlantic Coast Line Railroad Company alone, the case having been dismissed as to the Norfolk and Western Railway Company.

At the trial of the cause upon the issue  joined on the amended declaration the  defendant demurred to the evidence, filing its grounds of demurrer, in which demurrer the plaintiff joined.   The jury assessed the plaintiff's damages at $3,000, subject to the opinion of the court on the demurrer to the evidence, and the court, overruling the demurrer, entered judgment for the plaintiff, to which judgment this writ of error was awarded.

By agreement of counsel for the respective parties, appearing in the record, all questions raised on the pleadings, except the demurrer to the evidence, are waived, and, therefore, the sole question for consideration here relates to the action of the trial judge in overruling the demurrer to the evidence and entering judgment thereon for the plaintiff.

The plaintiff, an employee of the Eagle Steam Laundry, Inc., on the morning of Thursday (Thanksgiving day), November 28, 1907, about 9 o'clock, was driving a gentle horse, hitched to a closed wagon belonging to the laundry company, eastwardly along Hull

street, in what was then the city of Manchester, but subsequently became a part of the city of Richmond, and at the point where the defendant's line of railroad crosses Hull street at right angles a regular scheduled train of the defendant, commonly known as the "Cannon Ball" train, running about one minute behind its schedule time, collided with the wagon which the plaintiff was driving, and he was thrown to the ground and injured.

At the point of the accident the defendant's railroad track has the general direction of north and south, while Hull street has the general direction of east and west, and along the centre of Hull street and over the railroad tracks crossing it a trolley street-car line is operated. Pursuant to an ordinance of the city of Manchester, requiring the defendant to constantly keep its crossing of certain named streets, including Hull street, guarded by flagmen or proper gates, the defendant undertook to maintain gates at the Hull street crossing, which is a much used crossing. These gates are operated from a tower located north of Hull street and east of the railroad, at the northeast corner of the intersection of the railroad and Hull street; and just across the street from the tower, to the south, on the same side of the railroad tracks as the tower, but sitting back further from Hull street, is situated the defendant's depot. Three railroad tracks cross Hull street at this point, the middle one being the main track, over which the defendant operates its through trains, the other two being side tracks, upon which cars are shifted and trains made up. On the Swansboro, or west, side of these tracks were two gates, a short one across the sidewalk and a long one across the greater portion of the roadway, but leaving room enough to drive around it on that side when the gate was down. On the Manchester and Richmond, or east, side of the railroad were three gates—one across the sidewalk of Hull street and two across the driveway of the street, entirely closing it when the gates were down.

On the occasion of the accident to the plaintiff he was driving his laundry wagon along Hull street from the direction of the locality known as Swansboro towards the cities of Manchester and Richmond; and when he approached the gate in the street on the Swansboro side, which was down, and where he stopped,

a shifting engine, moving freight cars, was passing on the middle, or the east track of the railroad, either pulling or pushing the cars attached to it to the south, but soon changed its direction and came back northwardly on the west track and across Hull street, stopping just as Hull street was cleared. Whether this train of cars stopped after clearing Hull street with its engine next to the street or its rear car is not by any means made clear by plaintiff's evidence, since his statement is that the rear car was next to the street, while other witnesses for him say that the engine was pushing the cars and stopped at the north side of the street after clearing it. Be this, however, as it may, for whether this train stopped with its engine or rear car next to Hull street, vision of a train approaching from the north on the main track was obstructed from the point at which plaintiff was standing with his wagon waiting for the street crossing to be cleared.

When plaintiff stopped with his horse at the gate across Hull street an electric car, coming also from the west, or Swansboro, side of the railroad, came up and stopped immediately behind his wagon. The evidence very clearly shows that as soon as the freight cars cleared the street the gate on the Swansboro side went up sufficiently high for plaintiff's wagon to pass under it, and he thereupon started across the railroad tracks with his horse in a trot, being urged on by the whipping of the reins upon his back, and, at the same time, the conductor of the electric car, E. V. Bowles, went forward, as was his custom and duty, towards the main line of the railroad, with the view of signaling his car forward if the way was found to be clear. Bowles, testifying for the plaintiff in this cause, after stating that his car came down from Swansboro and stopped at the gate, with plaintiff's wagon in front of his car, or almost in front of it, says: "There was a shifting engine pulling some cars by. After the shifting engine pulled by the gates went up, and I went out to flag the motorman across. * * * Then the laundry wagon drove by. I was right beside him. He and I went both across together. * * * Just as I got by the box car I saw the other train coming up. I jumped back out of the way. Just as I jumped back the train hit the wagon and knocked it back over there. I got back out of the way myself. When I got back the gates were down. * * *

28

He had let them down again." Then, after stating that the gates
were down when his car reached the railroad crossing, that when
the cars pulled by and the gates went up plaintiff's wagon started
across, and he started almost at the same time, Bowles says that
the plaintiff did not go around the gate, and his statements are
borne out by that of the plaintiff and by other witnesses testifying
for him, who were eye-witnesses of what took place.

As to whether the gates on the Manchester side went up at
the same time or not, five witnesses have testified, two of them
for the plaintiff and three for the defendant, plaintiff's witnesses
saying they "did not know whether they were up or down," while
defendant's witnesses state positively that they were down.
There is evidence for the plaintiff tending to prove that the mist
and smoke from the shifting engine impaired, if it did not obstruct,
the view of the gates on the Manchester side by the plaintiff
while standing at the gate on the Swansboro side. These gates
at the Hull street crossing, as we have seen, were operated from
a tower, erected and used for the purpose of keeping watch for
approaching trains, and were to be lowered as the situation might
require, for the purpose of preventing travelers of Hull street
from coming in contact or collision with railroad trains crossing
the street. One Morgan, the employee of the defendant, at the
time of the accident out of which this suit arises, was in the tower
at his post of duty a short while before the accident, but, with the
purpose in view of preparing a "Thanksgiving stew," went to the
ground floor below, leaving one C. H. Fowler, a boy about fourteen
years of age, alone in the tower, with instructions to look out for
passing trains or engines, and how to lower the gates in case an
engine or train was seen approaching the crossing, but no in-
structions as to how to raise the gates. These gates were, of course,
not intended to be raised by any other agency than that installed
by the defendant, and why or how those on the Swansboro side
were raised on this occasion is wholly unexplained. Fowler,
who just happened to be in the tower, and had been there but once
before, testifying for the plaintiff, says that Morgan told him
how to lower the gates, but gave him no instructions as to how
to raise them; that after he had lowered the gates and the shifting
engine had gone across, "he called to Morgan twice, and told

him that the train had gone across that crossing," to which Morgan replied that he would "be up there directly"; and that he called to Morgan to raise the gates because he (witness) knew they should be raised when the train was off the crossing, but made no attempt to raise them himself, and did not know anything about how they came to be raised, as there wasn't anybody in the tower but him— "I know I didn't raise them." Morgan, the gate-keeper, was at the bottom of the tower, and when called to by the boy, Foster, twice to come and raise the gates, replied to each call by saying that he would come up into the tower and raise the gates, but he had not gotten up into the tower when the accident to the plaintiff occurred.

It is true that defendant's witnesses testify that these gates never went up before the accident, and that the plaintiff drove around the end of the gate on the Swansboro side as soon as the shifting engine had passed, in his endeavor to hurry over the crossing; but, although none of plaintiff's witnesses state that the gates on the Swansboro side went up entirely, they do testify that they went up sufficiently for the plaintiff to pass his wagon under them, and Morgan, who was on the ground, familiar with the operation of these gates, and who doubtless might have given some explanation as to how the gates on the Swansboro side came to go up after the shifting engine and cars had passed the street and before he returned to the tower, was not introduced to testify concerning the occurrence.

Upon this evidence, had the case been submitted to the jury, properly instructed, it would have been sufficient to warrant a finding by them that the defendant was guilty of the negligence charged in the declaration with respect to the lack of due care in the operation of the gates on the occasion of this accident as a safeguard against accidents to travelers in Hull street at its crossing of the defendant's tracks, and, under the well-established rule governing the consideration of the case upon a demurrer to the evidence, this court must so hold.

The case was also one for the jury upon the question of the plaintiff's contributory negligence, which is an affirmative defense, the burden of maintaining it being upon the defendant, and therefore we are brought to the question (which has been given

the careful consideration which the nature of the evidence requires) whether or not, had the case been fairly submitted to the jury, they would have been warranted in finding from it that the plaintiff was free from such negligence as would have barred his right to recover in this action?

It is also well settled that when the consideration of the evidence is taken from the jury by demurrer to the evidence, if the jury could have found therefrom that the demurree was free from negligence contributing proximately to the causes of his injury, the court must so find.

Much stress has been laid in the argument for the defendant upon the admission of the plaintiff that he was perfectly familiar with the Hull street crossing and all its surroundings, as he had been driving across it, about the same time of the day, for about a year prior to the accident to him; but when this admission is considered along with the other evidence for him, we do not think the admission is entitled to the weight that the learned counsel argues should be given it. Fowler, in the tower, did not see or hear the "Cannon Ball" train coming on the main track, and thought the crossing was clear after the shifting engine and cars cleared it, as he called to Morgan twice to come up in the tower and raise the gates. Bowles, conductor of the electric car, evinces familiarity with the crossing, and testifies that when the shifting engine and cars cleared the crossing, and the gate went up, he, as did the plaintiff, thought the crossing clear, and went forward to flag his car across, barely escaping being himself struck by the "Cannon Ball" train, the approach of which he did not discover until he had passed the freight cars. He further says that when he first knew of the approach of the train, and jumped back to prevent being hit by it, the plaintiff's horse was on the main track, with the train moving at a rapid speed, and only a few feet from him.

Tinsley, motorman on the electric car, corroborates the statements of the plaintiff and Bowles as to the situation at the crossing, the passing of the shifting engine and cars to the north of the crossing, the going up of the gate in front of plaintiff's horse, where he had been standing about two or three minutes, and that the approaching "Cannon Ball" train could not be seen from where they were standing, because of the obstruction of the view

by the engine and cars which had stopped on the west track, just north of the crossing. He further testifies: "My conductor jumped off the car, and as the gates were raised the wagon pulled on across the crossing. After he heard the (shifting) engine pass, the conductor ran alongside the wagon about the rear of it. About the time I got ready to start, this 'Cannon Ball' train hit the laundry wagon, and knocked the horse on the other side of the track, and the wagon stayed on the side towards Swansboro—knocked the driver (plaintiff) out. I got off to help pick him up. After that the gates were let down again, after the wagon was struck. If it had been a half a minute longer it would have struck my car. I was fixing to cross myself after the gates were raised, and it came near about hitting my conductor."

Clements, another of plaintiff's witnesses, was standing between the gate on the Swansboro side and the railroad tracks, waiting for the shifting engine and train to pass, and when it cleared the crossing he, too, started across, a little behind plaintiff's wagon, and escaped being hit by the "Cannon Ball" only by jumping back. He describes the occurrence fully, and says that he was thinking about something else at the time, and only heard the train coming in time to jump back out of its way; the plaintiff being then with his horse's head on the main track.

Hinchey, another witness for the plaintiff, was the only eye-witness of the accident who saw it from the east or Manchester side. He was standing with his back to the gates on the Manchester side, facing the gates on the opposite side of the railroad tracks where the plaintiff's wagon had been standing, and says that as soon as the crossing was passed by the shifting engine and cars going towards Richmond, the plaintiff started across, and he (witness) waved and yelled at him, but "he didn't stop at all; just kept coming." This witness, however, fails to show that the plaintiff saw him waving, or heard him yelling; nor does he say that the plaintiff could have seen or heard the approaching train had he looked and listened for it. All the witnesses agree that the vision of the approaching train was obstructed from the point where plaintiff's wagon had been standing, and a number of them practically say that the noise made by the ringing of the bell on the shifting engine was sufficient to prevent

the plaintiff from hearing the train coming from the north. The plaintiff says that he neither heard nor saw it. True, he says, that he only glanced in both directions before starting across the railroad tracks, but he could not have seen the approaching train had he looked after starting, and he was not alone in believing it to be safe to go across after the gates went up, as the witnesses Bowles, Clements, and Tinsley took the same view of the situation.

Kelley, engineman on the "Cannon Ball" train, examined as a witness for the defendant, when asked, on cross-examination, if he could see plaintiff's wagon, answered, "I couldn't see it until it passed the man's tank," (referring, doubtless, to the tank or tender of the shifting engine standing on the west track at the street crossing). "Q. Could the man have seen you? A. No, sir; not to save his life. Q. You could not have seen the man, and that man could not have seen you? A. I don't think he could have seen me, because the smoke and steam of that engine would have hid my train from him, and also hid him from me. Q. Neither could see the other? A. No."

Under similar conditions to those described by witness Kelley, this court said, in *Southern Railway Company* v. *Aldridge's Adm'r*, *infra*, that a higher degree of caution is required of both the traveler and the railroad company than if the obstructions and noises did not exist; the degree of caution required of both parties being in proportion to the danger caused by the obstruction and noises.

The case of *Rangeley* v. *Southern Railway Company*, 95 Va. 715, 30 S. E. 386, holds, as do practically all the authorities, that open gates at a railroad crossing are no guaranty of safety, meaning, of course, that open gates do not relieve a traveler of a highway crossing the railroad of the duty to exercise ordinary care for his own safety; but those cases recognize that the raising of the gates is a circumstance which justifies the traveler of the highway in starting to cross the railroad, and further recognize that whether one injured in such circumstances exercised due care for his own safety is a question for the jury.

In the case of *Rangeley* v. *Southern Railway Company*, *supra*, where the facts were very similar to those which the evidence in this case tended to prove, the question, whether the plaintiff's

intestate used that degree of care which an ordinarily prudent person would use under like circumstances, was fairly submitted to the jury, who found for the defendant, and this court held that the evidence, considered as upon a demurrer thereto, justified the jury in finding the verdict they did, and affirmed the judgment of the trial court.

So, in the case of *Southern Railway Company* v. *Aldridge's Adm'r*, 101 Va. 142, 43 S. E. 333, where the railroad company had been permitted by the city of Danville to temporarily substitute a watchman for gates at a grade crossing, and the accident to Aldridge followed, it was held that the railroad company was guilty of negligence, and although the accident might not have happened if the deceased had stopped or paused, still his failure to stop did not, as a matter of law, make a case of contributory negligence so plain as to justify the court in withdrawing it from the jury.

In the case before us we have discussed, perhaps at greater length than was necessary, the evidence bearing upon the question of the plaintiff's contributory negligence, and the conclusion reached is that the facts do not so plainly disclose his negligence that reasonable men should not differ in their judgment upon it. *Rangeley* v. *Southern Railway Company, supra; Kimball & Fink* v. *Friend*, 95 Va. 125, 27 S. E. 901; *Marshall's Adm'r* v. *Valley Railway Company*, 99 Va. 798, 34 S. E. 455; *C. & O. Railway Company* v. *Williams*, 108 Va. 689, 63 S. E. 796, and cases cited.

The plaintiff assigns as cross-error the failure of the trial court in its judgment to make plain that the amount of damages ascertained by the verdict of the jury should bear interest from the date of the verdict.

It is conceded that the assignment is meritorious, since the statute (sec. 3390, Code of 1904) provides: "If a verdict be rendered which does not allow interest, the sum thereby found shall bear interest from its date, and judgment shall be entered accordingly."

It follows that the judgment of the trial court will be corrected in the respect that the cross-error assigned by the plaintiff points out, and as so amended will be affirmed.

*Amended and Affirmed.*